**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHARINE SULLIVAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EDGEWOOD SURGICAL HOSPITAL PAIN MANAGEMENT LLC,<br><br>Defendant. | Case No.<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Katharine Sullivan ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Edgewood Surgical Hospital Pain Management LLC ("Defendant" or "Edgewood"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge, counsel's investigation, and information and belief, as follows:

## INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former patients' ("Class Members," defined *infra*) sensitive information, including their names and protected health information ("PHI" or "Private Information") like medical histories, surgical case reviews, anesthesia records, and MRI scans.[1]

2. Healthcare entities that handle PHI owe a non-delegable duty to the individuals to whom that data relates. This duty arises because it is foreseeable that its exposure to unauthorized

---

[1] *Ransomware Group 'Thegentlemen' Claims Attack on Edgewood Surgical Hospital*, QPULSE (June 4, 2026), https://qpulse.quasarcybertech.com/news/3824/ransomware-group-thegentlemen-claims-attack-on-edgewood-surgical-hospital/.

persons—especially to hackers with nefarious intentions—will result in harm to the individuals to whom the information relates.

3. The harm resulting from a data breach manifests in a number of ways, including identity theft or medical fraud. The exposure of a person's PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take additional prophylactic measures.

4. Defendant Edgewood is a "a fully licensed state-of-the-art specialty hospital focused on delivering superior medical services, outpatient and inpatient surgical procedures, and diagnostic imaging."[2]

5. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed a resulting duty to secure, maintain, protect, and safeguard the Private Information with which it was entrusted against unauthorized access and disclosure through adequate security measures. Defendant is also aware that PHI are highly valuable to cybercriminals, making it foreseeable that Defendant would be the target of a cyberattack.

6. Despite Defendant's duty to safeguard the PHI with which it was entrusted, and the foreseeability of a data breach, Plaintiff's and Class Members' Private Information stored by Defendant was accessed and acquired when it experienced a cyber security incident beginning on or about June 3, 2025 (the "Data Breach" or "Breach").[3]

---

[2] *About Us*, EDGEWOOD SURGICAL HOSP., https://edgewoodsurgical.com/about-us/ (last visited June 8, 2026).

[3] QPULSE, *supra* note 1.

7. As a direct and proximate result of Defendant's failure to implement and follow basic, standard security procedures, Plaintiff's and Class Members' PHI has been compromised by cybercriminals and disclosed to unauthorized persons. Plaintiff and Class Members have suffered harm and remain at a significantly increased and certainly impending risk of fraud, identity theft, medical fraud, intrusion of their health privacy, and similar forms of criminal activity—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

8. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

9. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure its network containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

10. Plaintiff and Class Members have suffered injuries as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of Private

Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of Plaintiff and all similarly situated persons whose Private Information was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

11. Plaintiff, individually and on behalf of the Class, brings claims against Defendant for negligence, breach of fiduciary duty, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

12. Plaintiff Katharine Sullivan is, and at all relevant times was, a resident and citizen of the State of Ohio, residing in Brookfield, Ohio.

13. Defendant Edgewood Surgical Hospital Pain Management LLC is a Pennsylvania limited liability company with its principal place of business located at 239 Edgewood Drive Extension in Transfer, Pennsylvania 16154.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than

100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15. This Court has personal jurisdiction over Defendant because it is organized under the laws of the Commonwealth of Pennsylvania and maintains its principal place of business in Pennsylvania.

16. Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, Defendant resides in this District; and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Defendant Collected and Stored Plaintiff's and Class Members' PHI

17. Defendant Edgewood is a fully licensed, physician-owned specialty hospital focused on delivering superior medical services, outpatient and inpatient surgical procedures, and diagnostic imaging.[4] Edgewood's services include ophthalmology, orthopedics, spine and pain management, pre-op testing, and radiology.[5] Along with its hospital in Transfer, Pennsylvania, Edgewood also maintains additional locations for spine and pain management in Transfer and Erie, Pennsylvania, along with an additional surgery center in New Castle, Pennsylvania.[6]

18. In the regular course of its business, Defendant collects and maintains the PHI of its patients, former patients, and other persons to whom it is currently providing or previously provided healthcare-related services.

---

[4] *About Us*, *supra* note 2.

[5] *Services*, EDGEWOOD SURGICAL HOSP., https://edgewoodsurgical.com/services/ (last visited June 8, 2026).

[6] *Id.*

19. Defendant requires patients to provide it with their Private Information before it provides healthcare-related services. That information includes, *inter alia*, names, addresses, dates of birth, and health insurance information, as well as information regarding prior care, such as medical record numbers and treatment information, including diagnoses and dates/types of treatment. Defendant stores this information digitally.

20. Plaintiff and Class Members entrusted Defendant with their sensitive and confidential PHI and, therefore, reasonably expected that Defendant would safeguard and keep confidential their highly sensitive PHI.

21. Due to the sensitivity of the PHI that Defendant handles, collects, and stores, Defendant was aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

22. By requesting, obtaining, collecting, storing, and deriving benefits from Plaintiff's and Class Members' PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

23. Edgewood's HIPAA Privacy page states, "We implement appropriate security measures to protect your personal information against unauthorized access, alteration, disclosure, or destruction."[7]

24. Despite Edgewood's representations and the existence of its duties, it failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PHI and ultimately allowed threat actors to compromise Plaintiff's and Class Members' PHI.

---

[7] *See Privacy Policy*, EDGEWOOD SURGICAL HOSPITAL, https://edgewoodsurgical.com/privacy/ (last visited June 7, 2026).

### B. The Risks of Storing Valuable PHI Are Well Known in the Healthcare Industry

25. Given its frequent handling of sensitive data, Defendant was aware at all relevant times that the PHI that it obtains, collects, stores, uses, and derives a benefit from is highly sensitive and is of significant value to those who seek to use it for wrongful purposes.

26. Defendant also knew that a breach of its data systems, and the exposure of the information stored therein, would result in the imminent risk of identity theft and fraud for the individuals whose PHI were compromised, as well as intrusion into their highly private health information.

27. These risks are not theoretical; in recent years, data breaches at healthcare companies have become ubiquitous, with a new breach seemingly announced every few days.[8] The slew of healthcare data breaches over the last few years has surely put Defendant on notice that its electronic records will be targeted by cybercriminals.

28. PHI has considerable value and constitute enticing and well-known targets for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[9] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

29. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach

---

[8] *See generally* Steve Alder, *Healthcare Data Breach Statistics*, THE HIPAA J. (Feb. 26, 2026), https://www.hipaajournal.com/healthcare-data-breach-statistics/.

[9] Brian Krebs, *The Value of a Hacked Company*, KREBS ON SEC. (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[10]

30. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2025, the Federal Trade Commission's Consumer Sentinel Network received 6.2 million reports of some form of identity fraud compared to 5.3 million in 2022.[11]

31. The healthcare industry in particular has become a prime target for threat actors: "Cyber attacks occur in every industry and sector. However, healthcare organizations are at special risk, largely due to the fact that the information they produce and manage is a particularly alluring target for attackers."[12] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific—and now obsolete—operating systems and cannot be transferred to supported operating systems."[13]

32. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2024, 6,759 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights. Those breaches have

---

[10] *2024 Global Threat Intelligence Report*, FLASHPOINT (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[11] *See* Consumer Sentinel Network Data Book, 2021-2025, FED. TRADE COMM'N, https://public.tableau.com/app/profile/federal.trade.commission/viz/ConsumerSentinel/Infographic (last visited May 29, 2026).

[12] *The Healthcare Industry is at Risk*, ORDR (Feb. 20, 2024), https://ordr.net/learn/healthcare-cyber-attacks/.

[13] Steve Alder, *Why Do Criminals Target Medical Records*, THE HIPAA J. (Jan. 10, 2026), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

resulted in the exposure of 846,962,011 individuals, which equates to more than 2.6 times the population of the United States.[14]

33. In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[15] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[16]

34. "In 2024, the protected health information of 276,775,457 individuals was exposed or stolen. On average, that is 758,288 records per day[.]"[17]

35. The breadth of data compromised in the Data Breach here makes the information particularly valuable to cybercriminals and leaves Plaintiff and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

36. **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[18] A complete identity theft kit that includes health insurance

---

[14] *Krebs*, *supra* note 9.

[15] Steve Alder, *Security Breaches in Healthcare in 2023*, THE HIPAA J. (Jan. 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[16] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA TODAY (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

[17] *Krebs*, *supra* note 9.

[18] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[19]

37. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[20]

38. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts—far more than is usually possible with stolen credit card information."[21]

39. According to Healthcare Facilities Today:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data [to] open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims

---

[19] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security® Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30, 2014), https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-security-survey-2015.pdf.

[20] Adler, *supra* note 15.

[21] *Id.*

> spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[22]

40. Even when cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

41. The development of Fullz packages means stolen PII/PHI from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII/PHI stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

42. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take-overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[23] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary

---

[22] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, HEALTHCARE FACILITIES TODAY (June 14, 2018), https://www.healthcarefacilitiestoday.com/posts/Healthcare-data-breach-What-to-know-about-them-and-what-to-do-after-one--18729/.

[23] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Dec. 18, 2025), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[24]

43. Based on the value of individuals' PHI to cybercriminals, and the foreseeability of a data breach, Defendant knew or should have known the importance of safeguarding the PHI entrusted to it and of the foreseeable consequences that would arise if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### C. Defendant Breached Its Duties to Protect PHI

44. As noted above, on or about June 3, 2026, Edgewood experienced a cybersecurity incident that led to unauthorized access to its computer systems, compromising the PHI of its current and former patients.

45. According to the reporting, the notorious ransomware group TheGentlemen exfiltrated approximately 500GB of Edgewood patient PHI, including anesthesia records, medical files, and protected health information.[25]

46. As a direct and proximate result of Defendant's failure to implement and maintain adequate security measures, Plaintiff's and Class Members' PHI was exposed to unknown, malicious actors during the Data Breach. It will be nearly impossible for Plaintiff and the Class to ensure that their stolen PHI have been secured and not further disseminated.

---

[24] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

[25] *Edgewood Surgical Hospital Hit by TheGentlemen Ransomware*, GALAXYWARDEN (June 4, 2026), https://www.galaxywarden.com/blog/breach/edgewood-surgical-hospital-ransomware-june-2026.

**D. Defendant Failed to Comply with HIPAA Requirements**

47. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

48. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[26] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

49. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

50. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

51. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

52. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

---

[26] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

53. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entities or business associates creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforces.

54. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

55. Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

56. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

57. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "*without unreasonable delay and in no case later than 60 days following discovery of the breach*."[27]

58. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

59. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

60. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." U.S. Department of Health & Human Services, Security Rule Guidance Material.[28] The list of resources includes a link to guidelines set by the National Institute of

---

[27] *Breach Notification Rule*, U.S. DEP'T HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited May 29, 2026) (emphasis added).

[28] *Security Rule Guidance Material*, U.S. DEP'T HEALTH & HUM. SERVS., http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited May 29, 2026).

Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, Guidance on Risk Analysis.[29]

**E. Defendant Failed to Follow FTC Guidelines**

61. Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

62. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

63. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

64. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone

[29] *Guidance on Risk Analysis*, U.S. DEP'T HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited May 29, 2026).

is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

65. The FTC further recommends that companies not maintain personal information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

66. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67. These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

68. Defendant failed to properly implement basic data security practices.

69. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

70. Defendant was at all times fully aware of its obligation to protect the Private Information about whom it stored Private Information. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F. Defendant Failed to Comply with Industry Standards**

71. As described above, experts studying cybersecurity routinely identify healthcare providers and their business associates as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

72. Several best practices have been identified that at a minimum should be implemented by HIPAA covered business entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

73. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

74. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

75. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

### G. Defendant Knew That Criminals Target Private Information from Healthcare Entities

76. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PHI preceding the date of the Breach.

77. At all relevant times, Defendant knew, or should have known, Plaintiff's and all other Class Members' PHI was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyberattacks that Defendant should have anticipated and guarded against.

78. "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[30]

79. Cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, the healthcare compliance company Bluesight found there were 1,160 medical data breaches in 2024, with a staggering 300 million patient records expose—a 26% increase from 2023.[31]

---

[30] *9 Reasons Why Healthcare Is the Biggest Target For Cyberattacks*, SWIVELSECURE, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Mar. 23, 2026).

[31] *2025 Breach Barometer*, BLUESIGHT (2025), https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf.

80. In 2025, the frequency of healthcare data breaches "more than doubled," according to Fortified Health Security's 2026 Horizon Report. Though fewer total patient records were implicated in 2025 medical data breaches as compared to 2024, the "[t]otal breach volume in 2025 surpassed 2024 by 112%[,]" indicating a new trend characterized by "[a]ttacks that come faster, hit more healthcare organizations, and strain teams through repetition rather than scale."[32]

81. Healthcare related breaches, in particular, have continued to rapidly increase because electronic patient data is seen as a valuable asset. In fact, entities that store patient information "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[33]

82. According to a 2025 report released by IBM Security and the Ponemon Institute, "healthcare recorded the highest average breach cost among industries for the 12th consecutive year[,]" and such breaches "took the longest to identify and contain at 279 days."[34]

---

[32] Jill Hughes, *2025: Double the Breaches, but Less Patient Data Compromised*, INFORMA TECHTARGET (Jan. 15, 2026), https://www.techtarget.com/healthtechsecurity/news/366637268/2025-Double-the-breaches-but-less-patient-data-compromised.

[33] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC. (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited Mar. 23, 2026).

[34] *Cost of a Data Breach Report 2025: The AI Oversight Gap*, IBM SEC. & PONEMON INST., https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (last visited Mar. 23, 2026).

83. Private Information is a valuable property right.[35] The value of Private Information as a commodity is measurable.[36] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[37] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[38] It is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

84. As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, SSNs, PHI/PII, and other sensitive information directly on various internet websites, making the information publicly available. This information, from various breaches including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

---

[35] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. & COMMC'N TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[36] *See Healthcare Data Breach Statistics 2025: Why Medical Records Are Worth 10× More Than Credit Cards*, PATIENT PROTECT (Nov. 4, 2025), https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards.

[37] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, OECD PUBL'G (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[38] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

85. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[39] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[40] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[41]

86. Private information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[42] Experian reports that a stolen credit or debit card number can sell for $10 to $240 on the dark web.[43] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[44] Criminals can also purchase access to

---

[39] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAG. (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[40] *Id.*

[41] Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[42] Anita George, *Your Personal Data Is For Sale On the Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[43] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[44] Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MEDIA (July 16, 2013), https://www.scworld.com/news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

entire company data breaches from $900 to $4,500.[45] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen SSN or credit card number.[46]

87. Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[47] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[48]

88. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[49]

89. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[45] *In the Dark*, VPNOVERVIEW.COM, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 29, 2026).

[46] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIV. (Apr. 8, 2014), https://nsarchive.gwu.edu/document/18867-national-security-archive-department-justice.

[47] *See* Andrew Steger, *supra* note 39.

[48] *Id.*

[49] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

90. Indeed, cyberattacks against the healthcare industry have been common for over ten years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[50]

91. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals … because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[51]

92. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[52]

93. Defendant was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related

[50] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[51] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[52] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack,* SEC. MAG. (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[53]

94. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[54]

95. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiff and Class Members.

96. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even when cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

97. The development of Fullz packages means stolen PHI from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and

---

[53] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited May 29, 2026).

[54] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASSOC. (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PHI stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

98. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take-overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[55] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[56]

99. Defendant was on notice that the federal government has been concerned about healthcare company data encryption practices. Defendant knew its employees accessed and utilized protected health information in the regular course of their duties, yet it appears that information was not encrypted.

100. The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health

---

[55] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Dec. 18, 2025), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[56] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[57]

101. Additionally, as companies became more dependent on computer systems to run their business,[58] e.g., working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[59]

102. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its server(s), amounting to potentially hundreds of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

103. As a HIPAA covered business, Defendant knew or should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in its unprotected files.

104. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Personal Information of Plaintiff and Class Members.

---

[57] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. DEP'T HEALTH & HUM. SERVS., (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[58] *Implications of Cyber Risk for Financial Stability*, BD. GOVERNORS OF THE FED. RESERVE SYS., (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[59] *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS SEC., (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

105. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—PHI––fraudulent use of that information and damage to victims may continue for years.

**H. Plaintiff and Class Members Suffered Damages**

106. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members have already been caused to and must continue to devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

107. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' PHI has been greatly diminished by its exposure in the Data Breach.

108. As a result of Defendant's failures, Plaintiff and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes following the Data Breach. Those who are affected experience heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

109. With respect to data breaches specifically in the healthcare sector, a study conducted by researchers from Michigan State University and Johns Hopkins University has found

that "[m]ore than 70 percent of hospital data breaches include sensitive demographic or financial information that could lead to identity theft or fraud."[60]

110. Another report stated that, "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[61]

111. The reality is that cybercriminals seek nefarious outcomes from a data breach, and "stolen health data can be used to carry out a variety of crimes."[62]

112. Health information in particular is likely to be used in detrimental ways. Cybercriminals can leverage sensitive personal health details and diagnoses to extort or coerce the victim and commit serious and long-term identity theft.[63]

113. Moreover, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[64]

---

[60] *More Than 70% of Hospital Data Breaches Include Sensitive Demographic or Financial Info That Could Lead to Identity Theft*, EUREKALERT! (Sept. 23, 2019), https://www.eurekalert.org/news-releases/484378.

[61] Robert Lemos, *State-Sponsored Cyberattacks Target Medical Research*, DARK READING (Aug. 21, 2019), https://www.darkreading.com/threat-intelligence/state-sponsored-cyberattacks-target-medical-research.

[62] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[63] *Id.*

[64] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

114. Plaintiff and Class Members are at continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect the PHI with which it was entrusted.

115. Additionally, Plaintiff and Class Members have suffered emotional distress, increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers as a result of the Data Breach.

### I. Plaintiff Sullivan's Experiences

116. Plaintiff Katharine Sullivan is a patient of Defendant and provided her PHI to Defendant to receive its healthcare-related services.

117. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Plaintiff's PHI, Defendant undertook a duty to act reasonably in its handling of Plaintiff's PHI. Defendant, however, did not take reasonable care of Plaintiff's PHI, leading to its exposure and compromise as a direct and proximate result of Defendant's inadequate security measures.

118. Plaintiff Sullivan is extremely careful with her Private Information. She stores her important personal documents in a safe and secure location and regularly checks her accounts for potentially fraudulent activity.

119. Since learning of the Breach, Plaintiff Sullivan has been required to spend valuable time and effort attempting to mitigate the harm caused by the Data Breach.

120. As a direct and proximate result of the Data Breach, Plaintiff Sullivan has suffered actual injury from having her PHI exposed and/or stolen, including: (a) efforts to mitigate the risk of misuse of her PHI; (b) damages to and diminution of the value of her PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using it for fraud or publishing the information for sale on the dark web; and (c) a loss of privacy.

121. Further, knowing that hackers accessed and possibly exfiltrated her PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff Sullivan to experience stress, anxiety, worry, and fear.

122. As a direct and proximate result of the Data Breach, Plaintiff Sullivan has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PHI compromised in the Data Breach.

## CLASS ALLEGATIONS

123. Plaintiff brings this action on behalf of herself and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23.

124. Plaintiff seeks to represent a Class of persons to be defined as follows:

> All individuals who are residents of the United States whose PHI was compromised in the Data Breach.

125. Excluded from the Class is Defendant Edgewood and its subsidiaries and affiliates, officers and directors, any entity in which Edgewood has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

126. The proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when Plaintiff moves for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

127. **Numerosity:** The members of the Classe are so numerous that the joinder of all members is impractical. The exact size of the Class and the identities of the individual members are ascertainable through Defendant's records, including but not limited to the files implicated in

the Data Breach. Based on the public information currently available, the Class includes approximately thousands of individuals. Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

128. **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether and to what extent Defendant had a duty to protect the PHI of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PHI, and breached its duties thereby;

c. Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PHI;

d. Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' PHI;

e. Whether Defendant breached its duty to exercise reasonable care in handling Plaintiff's and Class Members' PHI;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

h. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

129. **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PHI exposed and/or accessed by an unauthorized third party.

130. **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the interests of the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical, as explained above.

131. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

132. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

133. Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

134. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

135. Defendant owed a non-delegable duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PHI relating to Plaintiff and the Class in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

136. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PHI in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

137. Defendant's duty to use reasonable care arose from several sources, including but not limited to those identified below.

138. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PHI that are routinely targeted by criminals for unauthorized access, Defendant was obligated to

act with reasonable care to protect against these foreseeable threats. Defendant alone controlled its own technology, infrastructure, and cybersecurity. Defendant further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendant's unsecure and unreasonable data security measures.

139. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks that held Plaintiff's and Class Members' PHI.

140. Defendant's duty also arose from its position as healthcare business. Defendant holds itself out as a trusted business associates and trusted providers of healthcare and healthcare-related services, thereby assuming a duty to reasonably protect the information they obtain from patients. Indeed, Defendant, which receives, maintains, and handles the PHI with which it was entrusted, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

141. Defendant is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of Defendant's duties are identified above.

142. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through

some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient and member information that resulted in the unauthorized access and compromise of PHI; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees with access or credentials to systems and databases containing sensitive PHI.

143. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PHI would not have been accessed and compromised by cybercriminals.

144. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

a. Theft of their PHI;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PHI being placed in the hands of criminals;

h. Damages to and diminution in value of their PHI entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

145. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

146. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

147. Defendant's duties also arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164,

Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

148. Defendant's duties additionally arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to employ reasonable measures to protect and secure Private Information.

149. Defendant's duties further arise from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1302(d), *et seq.*

150. Defendant is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

151. Defendant violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtains and stores, and the foreseeable consequences of a data breach involving Private Information including, specifically, the substantial damages that would result to Plaintiff and Class Members.

152. Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

153. Plaintiff and Class Members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

154. The harm occurring as a result of the Data Breach is the type of harm the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

155. It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' Private Information to unauthorized individuals.

156. The injury and harm that Plaintiff and Class Members suffered was the direct and proximate result of Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Private Information; (iii) breach of the confidentiality of their Private Information; (iv) deprivation of the value of their Private Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

## COUNT II
## BREACH OF FIDUCIARY DUTY

157. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

158. Plaintiff and Class Members have an interest, both equitable and legal, in the PHI that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

159. As a healthcare provider, Defendant has a fiduciary relationship to its patients. By providing medical treatment and healthcare services for Plaintiff and the Class, Defendant has a duty to act in good faith and solely for the benefit of Plaintiff and Class Members in all matters related to their healthcare.

160. Defendant is in possession of individuals' PHI and confidential medical information that are not generally known. Plaintiff is very careful with PHI and does not disclose PHI of Plaintiff's own accord.

161. Plaintiff and Class Members neither consented to nor authorized the disclosure of their PHI to a criminal actor.

162. Defendant was negligent in the maintenance of its computer systems in which Plaintiff's and Class Members' PHI were stored. Defendant knew, or should have known, that the private information stored in its systems could be exploited at great cost to Plaintiff and the Class.

163. Plaintiff has suffered concrete injuries as a result of Plaintiff's PHI being exposed in the Data Breach.

164. Plaintiff has dedicated significant time to monitoring financial accounts, implementing credit freezes, registering for identity theft protection, and dealing with increased spam communications. As discussed *supra*, cybercriminals may store individuals' PHI for years before using it for fraudulent activity.

165. Beyond the impending risk of identity or medical fraud, Plaintiff and Class Members have suffered emotional distress from the exposure of their private medical information.

166. Further, Plaintiff and Class Members have suffered damage to and diminution of the value of their PHI, which has an ascertainable monetary value, as evidenced by the prices cybercriminals charge for it.

167. As a healthcare provider, Defendant breached its fiduciary duty to its patients by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff and the Class Members' PHI and medical records/information to a criminal third party.

168. Defendant's breach of its fiduciary duty to its patients was a real factor in bringing about Plaintiff's and Class Members' injuries. But for Defendant's failure to properly secure its computer systems, Plaintiff would not be required to spend time, money, and effort to protect themselves from imminent fraud.

169. In addition to Defendant's duty to keep Plaintiff's and Class Member's information confidential, Defendant failed to safeguard PHI that Plaintiff and the Class had no choice but to provide to receive medical treatment. Plaintiff and the Class were reliant on Defendant for necessary services. The imbalance of power between Plaintiff and Defendant further indicates that Defendant owed, and subsequently breached, a fiduciary duty to its patients.

170. As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT III
## BREACH OF IMPLIED CONTRACT

171. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

172. In connection with receiving medical treatment or services, Plaintiff and all other Class Members entered into implied contracts with Defendant.

173. Pursuant to these implied contracts, Plaintiff and Class Members paid money to Defendant, whether directly or through their insurers, and provided Defendant with their PHI. In exchange, Defendant agreed to, among other things, and Plaintiff understood that Defendant would: (1) provide medical treatment, services, or health plan benefits to Plaintiff and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PHI; and (3) protect Plaintiff's and Class Members' PHI in compliance with federal and state laws and regulations and industry standards.

174. The protection of PHI was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand. Indeed, as set forth *supra*, Defendant recognized the importance of data security and the privacy of its patients' PHI in its Privacy Policy.[65] Had Plaintiff and Class Members known that Defendant would not adequately protect its patients' PHI, they would not have received medical treatment or services from Defendant.

[65] *Privacy Policy*, *supra* note 7.

175. Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendant with their PHI and paid—directly or through their insurers—for health care treatment, services, or health insurance premiums from Defendant.

176. Defendant breached its obligations under its implied contracts with Plaintiff and Class Members by failing to implement and maintain reasonable security measures, protocols, and procedures to protect and secure Plaintiff's and Class Members' PHI in a manner that complies with applicable laws, regulations, and industry standards.

177. Defendant's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

178. Plaintiff and all other Class Members were damaged by Defendant's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PHI has been breached; (v) they were deprived of the value of their PHI, for which there is a well-established national and international market; and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT

179. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

180. This claim is pleaded in the alternative to Plaintiff's current and future contract-based claims.

181. By its wrongful acts and omissions described herein, Defendant has obtained an undue benefit from the PHI entrusted to it by Plaintiff and Class Members.

182. Defendant was aware of, appreciated, and/or understood the undue benefit it obtained from its transactions with Plaintiff and Class Members.

183. Defendant, prior to and at the time Plaintiff and Class Members entrusted their PHI to Defendant for the purpose of obtaining health services, caused Plaintiff and Class Members to reasonably believe that Defendant would keep such PHI and financial information secure.

184. Defendant was aware, or should have been aware, that Plaintiff and Class Members relied on its representations that the PHI kept in its custody would be secure. Plaintiff and Class Members would not have contracted with Defendant had they known that Defendant's information systems were sub-standard for that purpose.

185. Defendant also knew or should have known that if Plaintiff and Class Members became aware of the substandard condition of and vulnerabilities in its information systems, Plaintiff and Class Members would be much less likely to seek its services.

186. Defendant failed to disclose facts pertaining to its substandard information systems before Plaintiff and Class Members made their decisions to seek medical care. Instead, Defendant suppressed and concealed such information for months after the Data Breach occurred. By concealing and suppressing that information, Defendant denied Plaintiff and Class Members the ability to make informed decisions regarding their PHI and received an undue benefit.

187. Defendant was unjustly enriched at the expense of Plaintiff and Class Members. Defendant received profits, benefits, and compensation, in part, at the expense of Plaintiff and

Class Members. By contrast, Plaintiff and Class Members did not receive the benefit of their bargain because they sought healthcare services on the assumption that their private information would be secure in Defendant's possession.

188. Since Defendant's profits, benefits, and other compensation were obtained by improper means, Defendant is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized from these transactions.

189. Plaintiff and Class Members seek an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## COUNT V
## DECLARATORY JUDGMENT

190. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

191. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

192. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PHI. Namely, whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the

compromise of their PHI and remain at imminent risk that further compromises of their PHI will occur in the future.

193. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a. Defendant owed a legal duty to secure patients' PHI under common law and Section 5 of the FTC Act; and

b. Defendant breached and continues to breach these legal duties by failing to employ reasonable measures to secure patients' PHI.

194. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PHI.

195. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach of Defendant's systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendant's systems occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

196. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

197. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendant's systems, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other members of the Class, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as a representative of the Class and appointing Class Counsel;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For compensatory damages on behalf of Plaintiff and the Class;

D. For punitive damages on behalf of Plaintiff and the Class;

E. For an order of restitution and all other forms of equitable monetary relief;

F. Declaratory and injunctive relief as described herein;

G. For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

I. Awarding pre- and post-judgment interest on any amounts awarded;

J. For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

K. Awarding of such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: June 9, 2026

*/s/ Andrew W. Ferich*
Andrew W. Ferich (PA 313696)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

*Counsel for Plaintiff and the Putative Class*